Argued and submitted December 17, 1986, reversed and remanded July 22, 1987

In the Matter of the Compensation of
Danny H. Collins, Claimant.

COLLINS,
*Petitioner,*

*v.*

HYGENIC CORPORATION OF OREGON et al,
*Respondents.*

(WCB No. 85-00760; CA A39404)

739 P2d 1073

Ralph M. Yenne, Salem, argued the cause for petitioner. On the brief were Charles D. Maier, and Gatti, Gatti, Maier, Smith & Associates, Salem.

John A. Reuling, Jr., Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

NEWMAN, J.

## NEWMAN, J.

Claimant seeks review of an order of the Workers' Compensation Board that affirmed the referee and denied his claim for medical services.[1] We reverse.

Claimant worked as a "snorkel bender." He sprayed cut plastic tubing with an aerosol lubricant, placed it in a metal mold, put the mold in an oven to bake and subsequently removed the mold from the oven and the tubing, or snorkel, from the mold. He worked on the mezzanine above the first floor of the building. Employer changed the lubricant to a silicone product containing 1,1,1 trichloroethane (3 TCE). Claimant and a co-employe started to use that spray on a Monday. During that work week, claimant was frequently exposed to the spray. By Wednesday night, after he had left work, he noted irritation at the back of his throat and upper chest and labored breathing. Claimant testified that, by Thursday, "I felt like there was a — a numbness in top of my lungs here right before I went to work — or right before I got off work." On Thursday night he decided "I was gonna quit 'cause I thought my health was in jeopardy. So I announced to them Friday when I went in to pick up my check that I was quitting."

On the following Tuesday, claimant went to see Dr. Shultz, an internist and specialist in pulmonary diseases. Shultz reported:

"The history obtained is certainly compatible with significant occupationally associated airway irritation of both upper and lower respiratory tracts. * * * It is conceivable that inhalation of an aerosol of this chemical could cause local airway irritation. Alternatively, the product when heated and vaporized might break down into other toxic gases causing airway irritation. There is no evidence * * * that this patient has sustained injury anatomically or physiologically to the lungs. However, in view of the severity of the symptoms, I would agree that a return to this work environment is ill advised. It is my opinion that this product should probably not be used due to the irritant effect of the Trichloroethane or that better ventilation of the facility should be provided.

"RECOMMENDATIONS: The patient is reassured as

---

[1] The charges were $100.

to the probable transient nature of his persisting respiratory symptoms. I have asked him to return if he continues to have respiratory difficulty, but have advised that he not return to this work environment as long as the current product is being utilized. I will attempt to contact his employers and advise them of the possible toxicity of this product. No return appointment is scheduled at this time."

Claimant did not return to Shultz for further treatment.

Subsequently, Shultz wrote to claimant's attorney:

"Specifically, I agree that [claimant's] inhalation exposure at Hygenic Corporation was probably the direct cause of his respiratory symptoms prior to the time he came to my office for evaluation. One of the constituents of the silicone spray used as a lubricant in the process of making snorkels was trichloroethane, a chemical which can be quite irritating to the airways of susceptible individuals. I suspect the heating process used in manufacturing the snorkels liberated considerable quantities of this product into the atmosphere. Although I did not personally inspect Mr. Collins' work place it is my understanding that the ventilation system was not exhausted to the outside of the building in his immediate area of exposure."

Shultz testified that he had based his initial opinion "totally" on the accuracy of what claimant had told him. He also testified:

"The extent of my contact with regard to this product was I did call the Poison Control Center in Portland after I saw [claimant], and I asked them to look up in their records what this product was and what effects it could have.

"And I was advised that when aerosolized, this product could be irritating to the mucous membrances, which corresponded to my recollection of chlorine molecule products and confirmed my suspicion that this could be a factor contributing to his symptoms.

He testified further:

"[Claimant's] sensitivity to whatever was in his work environment atmosphere was probably an idiosyncratic type of reaction. * * * He might have sensitivity to a very minute quantity of this product, whereas other individuals might have a very low responsiveness to that type of product.

"* * * * *

"* * * [T]here is a spectrum of sensitivity in all industrially associated product exposure. * * * [T]here are a number of products which were considered to be in safe concentrations in years past which have subsequently been found to cause sensitivity in a certain number of individuals in the workplace.

"And while I would say that those standards are based on some objective data of which I am not aware, I think that there may be exceptions to that and it wouldn't necessarily convince me that his symptoms were unrelated to that."

In reply to a question whether he had made a "definite diagnosis," he stated:

"I think no diagnosis can be made without definite objective date to support that diagnosis. What I indicated was a high clinical suspicion that something in the patient's environment, in his workplace, was responsible for his symptoms. And based on the information I have, the most likely irritant was the trichloroethane spray used by him and his co-worker."

■ Claimant argues that he established that his exposure to 3 TCE was the major contributing cause of his need for Shultz's services. Insurer responds that claimant did not establish that he suffered an injury and, in any event, that he did not sustain his burden to show that his exposure to 3 TCE caused his symptoms. If claimant suffered the symptoms which he described, and if his exposure to 3 TCE was their major contributing cause, the medical services which Shultz performed were "required," even though Shultz found no objective evidence of the symptoms.[2] *See* ORS 656.005(8)(a).[3]

The referee, in affirming insurer's denial, relied on the report and testimony of the insurer's industrial hygienist, Natsch, who had monitored claimant's co-employe when he was working alone in the workplace. Natsch reported:

"The results indicated extremely low levels of 1,1,1-trichloroethane; 5.6 ppm compared to the Oregon Permissible Exposure Limit of 350 ppm.

---

[2] The referee stated:

"I do not think a viable Workers' Compensation claim can be established where there is no diagnosis and no symptoms upon medical examination."

[3] Insurer cites *Brown v. SAIF*, 79 Or App 205, 717 P2d 1289, *rev den* 301 Or 666 (1986), but there the claimant suffered no symptoms.

"The physician was also concerned that the heating of the spray and thermal decomposition products could be harmful. This does not appear likely since the oven is kept at a very low heat (180-220°). Temperatures in this range could cause faster volatilization. Higher temperatures would burn the plastic. Regardless the, employee is nowhere near the oven during the heating cycle."

He testified that 3 TCE "could be considered a toxic substance" and that its vapors can be harmful "at levels that would be recognized to be harmful." In answer to the question whether the toxic properties of 3 TCE could cause respiratory irritation, he testified:

"There's some bit of debate on that also, and the reason I say that in reviewing toxicology literature that's available in our library, the mention of acute effects as far as the symptomatology of acute exposure to the substance mentioned items of eye irritation and skin irritation, but there was no specific mention of respiratory irritation as far as acute effects, except in the fact of fairly high exposures where it might be related to a central nervous system effect that would effect the respiratory system."

He stated that the American Conference of Governmental Hygienists, which publishes "allowable limits in the workplace," are "not saying that [350 parts-per-million] is a safe level for everyone. * * * [T]he 350 part-per-million recommendation that they make is set to avoid irritation."

Natsch could not recall whether the windows "alongside the mezzanine room were 'openable'" during the tests that he had run with the co-employe.[4] He gave a carefully qualified answer to the question whether the oven emitted vapors and testified that he "wouldn't expect high levels." He stated that "as far as background levels in the room, I would expect that they would be very low." He testified that employer discontinued using 3 TCE after claimant quit, because "they were concerned if somebody could possibly have a problem with it that they would quit using it."

The referee discounted Shultz's report and testimony for several reasons. Shultz believed that vaporized gases emitted from the oven when it was opened were the most likely

---

[4] Employer testified that the windows open into the main part of the plant. Claimant testified that the windows did not open.

cause of claimant's symptoms. The referee found that no vaporized fumes were emitted from the oven "based on the test and testimony of [Natsch] that claimant would probably not be exposed to any residual spray when he unloaded the oven." Natsch's testimony, however, does not support that conclusion. Moreover, Shultz testified:

> "And whether there was product in the oven, meaning trichloroethane concentration in the oven, would be not important to me because he didn't work in the oven. But if he worked in the area where these nozzles were, where these snorkels were cooling, or in an area where the exhaust from that oven vented, then I would be concerned about the concentrations there.

> "But basically we're talking about theoretical data, I think, and that is whether the individuals who formed the group upon which the standard was based are the same as [claimant] in terms of their sensitivity."

The referee believed that claimant had been inaccurate in describing to Shultz "the degree of ventilation in the mezzanine area where claimant worked"[5] and observed that Shultz had not visited the workplace. It is not clear from the record, however, to what extent claimant's explanation to Shultz of the ventilation was inaccurate.[6] Claimant had been inaccurate in reporting to Shultz that his co-employe had suffered some symptoms from exposure to 3 TCE. Insurer's counsel, however, questioned Shultz about the significance of "a co-worker having some effects." Shultz responded:

> "[T]here are some compounds which are irritating to virtually

---

[5] Shultz testified:

"My understanding from the comments that were made by [claimant] at the time I saw him were [sic] that those rooms did have windows, but the windows were not open. That there were fans in the room which circulated the air, but the air was not exhausted to the outside of the building."

[6] Shultz testified:

"My understanding was that he worked on a second floor in a metal building with one other employee in an area that had no open window ventilation or any active exhaust system from that work area.

"* * * * *

"I think the fact that it, the area was not, to my understanding, optimally ventilated for exposure to aerosolized or vaporized products would contribute to the probability that his symptoms were associated with one of these products."

all individuals. There are other compounds which are irritating only to hypersensative individuals.

"And he felt that his co-worker had had some adverse side effects, but he was not able to define exactly those side effects or if he, as I recall, he did not describe them as identical to his side effects."

Furthermore, although Shultz had no experience with 3 TCE, Natsch conceded that the chemical is toxic.

We do not agree with the referee that Shultz's testimony was "unimpressive" or that it represented a significant "erosion" of his report. We also do not agree that Shultz's report that "it is conceivable" that 3 TCE could cause local airway irritation materially reduces the effect of his concluding testimony that

"based on the information I have, the most likely irritant was the tricholoroethane spray used by him and his co-worker."

We are persuaded by claimant's testimony that he did suffer the symptoms that he described after his exposure to 3 TCE. It is not critical whether the vapors came principally from the oven or from spraying or from drying of the snorkels after they were taken from the oven or were simply part of the background levels in claimant's work area. It is undisputed that 3 TCE is toxic and that employer ceased to use it after the incident involving claimant. Moreover, Natsch recognized that, although claimant's exposure to 3 TCE was well below recognized safety levels, those levels were not necessarily safe for everyone.

We believe that the referee gave undue weight to Natsch's testimony. Schultz's opinion that exposure to 3 TCE was the probable cause of claimant's symptoms is persuasive. An entirely reasonable explanation, on this record, is that claimant is more susceptible than most people to 3 TCE and that his exposure on the job caused his symptoms. He was not exposed elsewhere to 3 TCE or other irritants and had had no previous respiratory ailments. Shultz testified:

"I didn't have any reason to think that his symptoms were psychologically mediated in any way or that his description of his symptoms as given to me were for any secondary gain at the time I saw him."

Accordingly, in the absence of any other reasonable explanation, we hold that claimant has carried his burden to establish that his exposure to 3 TCE on the job was the major contributing cause of the symptoms that required Shultz's medical services. The claim is compensable.

Reversed and remanded with instructions to accept the claim.