Argued and submitted March 18, affirmed October 15, 2014

In the Matter of the Compensation of
Lisa R. Davis-Warren, Claimant.

HORIZON AIR INDUSTRIES, INC.,
*Petitioner,*

*v.*

Lisa R. DAVIS-WARREN,
*Respondent.*

Workers' Compensation Board
1003965; A150352

337 P3d 959

Michael G. Bostwick argued the cause and filed the briefs for petitioner.

Jodie Anne Phillips Polich argued the cause for respondent. With her on the brief was Law Offices of Jodie Anne Phillips Polich, P.C.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

GARRETT, J.

## GARRETT, J.

Horizon Air Industries, Inc., petitions for reversal of an order by the Workers' Compensation Board. At issue on review is the board's conclusion that claimant, a flight attendant, suffered a compensable injury arising from an incident aboard one of employer's aircraft. We conclude that substantial evidence supports the board's findings that (1) claimant suffered an "injury" during the course of her employment and (2) that injury "required medical services," specifically a "test of pressure with hyperbaric oxygen." We, therefore, affirm the board's order.

The facts are not disputed. Claimant was working a Horizon Air flight from Bozeman, Montana, to Seattle, Washington. Five to 10 minutes into the flight, claimant could not take a normal breath. Moments later, the pilot notified the flight attendants that the plane was failing to fully pressurize as it ascended. Claimant felt like she was going to pass out. Another flight attendant, Johnston, also felt light-headed. Claimant sat down on the floor and asked for oxygen. Claimant and Johnston took breaths from an oxygen tank. The captain lowered the flight altitude, and there were no further pressurization problems during the flight. For the remainder of the flight, however, claimant continued to have trouble with breathing, dizziness, and nausea. Passengers were never informed of the cabin-pressurization problem. Most of the passengers seemed "okay" during the flight, although claimant saw three passengers who were nauseous and one who actually vomited. Johnston saw one passenger who looked "sickly."

Upon arrival in Seattle, claimant, who was scheduled to work a flight to Canada, instead returned home to Portland (as a passenger). Claimant's husband picked her up at the Portland airport because she did not feel able to drive. Claimant's symptoms continued to worsen. According to her husband, claimant seemed "lethargic" and complained of headaches, faintness, and difficulty walking and breathing. When the couple arrived home in Forest Grove, claimant got in her own vehicle and drove to the Tuality Forest Grove Hospital. After being evaluated there, claimant was driven by ambulance to Providence Hospital.

Dr. Meghashyam examined claimant at Providence. Meghashyam asked about the incident aboard the flight and conducted a number of tests on claimant. Meghashyam testified that claimant "executed most of the commands well," but also noted that claimant was somewhat unsteady and had difficulty walking in a straight line. During the past-pointing test, which required claimant to reach out and touch a particular object, Meghashyam observed that claimant's hand would "go a little bit past [the object] and then come back." Meghashyam determined that claimant's symptoms may have been caused by the "changes in cabin pressure" that claimant described. Meghashyam consulted with the Divers Alert Network at Duke University and Travis Air Force Base to arrive at a treatment plan. Meghashyam determined that, based on claimant's symptoms and the "change in ambient pressure" that claimant had experienced, the standard of care would be a "test of pressure" by way of hyperbaric treatment. In total, claimant received five treatments in a hyperbaric chamber during a five-day hospital stay. Afterward, claimant felt significantly better but still complained of vertigo, short-term memory loss, and nausea. Claimant's "discharge diagnosis" was recorded by Dr. Barone as "[d]ecompression illness secondary to being in a depressurized plane at approximately 10,000 feet." Claimant's coworker, Johnston, never sought medical treatment following the pressurization incident. He did, however, report "feeling spacey" even after arriving in Seattle and decided to call in sick for his next scheduled day of work.

Claimant was subsequently treated by Dr. Braddock and Dr. Donahue, who diagnosed claimant with confusion, vertigo, and hypoxia. At employer's request, Dr. Burton examined claimant. Burton, who is board certified in occupational medicine and medical toxicology, also examined the incident report completed by the pilot. That report stated that the cabin pressure warning light came on as the plane reached approximately 12,000 feet. When the plane reached 18,000 feet, the "cabin altitude" was indicated at 14,000 feet for approximately five minutes. The cabin altitude decreased as the plane descended. The cabin pressure warning light turned off approximately 15 to 20 minutes

after it had come on. Burton concluded that the data failed to substantiate that a "decompression event" occurred on the flight. Burton concluded that claimant's symptoms were "psychogenic" in origin and unrelated to any workplace activity. He stated further that it was not plausible that claimant experienced hypoxia at a cabin altitude of 14,000 feet lasting 15 minutes.

Employer denied the claim for workers' compensation benefits. After a hearing, an administrative law judge (ALJ) upheld employer's denial on the basis that "claimant did not actually sustain any medical condition" from the flight. In reaching that conclusion, the ALJ found it particularly important that none of the doctors who examined claimant was able to testify that it was medically probable that the pressurization incident caused claimant to suffer from a specifically diagnosable medical condition. The ALJ noted, for example, that Meghashyam had testified that it was merely "possible," rather than "probable," that claimant had suffered decompression illness arising from an injurious work event. As the ALJ explained, claimant did not suffer a compensable injury because the "persuasive medical evidence" established that, "at the 'cabin altitude' air pressure to which claimant was exposed, for the duration that she was exposed, there was no possibility that she or another healthy person in her position would develop hypoxia, decompression illness, cerebral edema, or any other medical condition."

The board reversed, concluding that, under the circumstances, claimant was not required to prove that her exposure to low pressure resulted in a specifically diagnosable medical condition. The board relied heavily on *K-Mart v. Evenson*, 167 Or App 46, 1 P3d 477, *rev den*, 331 Or 191 (2000) (holding that a compensable injury was established where the claimant was exposed to HIV at the workplace, requiring testing and prophylactic treatment). Pertinent portions of the board's ruling are excerpted below:

> "Dr. Meghashyam, who is board-certified in hyperbaric medicine, concluded that claimant's exposure to abnormal cabin pressurization and resulting symptoms required medical services, specifically a 'test of pressure with hyperbaric oxygen.' We find that sufficient, under [*K-Mart*], to establish a compensable injury.

"In reaching that conclusion, we recognize that Dr. Burton opined that the incomplete cabin pressurization did not require medical services. That opinion was premised on his belief that 'altitude pressure of 14,000 feet [was] not capable of causing injury or harm' in 'a healthy person.' Dr. Meghashyam, however, persuasively explained that there was no such bright line cutoff for incurring an injury due to a change in ambient pressure, but rather that responses to such pressure changes were 'variable.' As an expert in hyperbaric medicine * * *, we defer to Dr. Meghashyam's opinion over that of Dr. Burton.

"We disagree with the employer's assertion that Dr. Meghashyam's opinion as to whether claimant's workplace exposure required medical services was only based on 'possibility,' as opposed to 'probability.' Although Dr. Meghashyam initially signed a concurrence letter stating that she could not say that it was 'medically probable that the [work] event was injurious,' she explained in her deposition that she signed that letter based on her understanding that 'medically probable' was to be defined as 'most definitely.'

"Moreover, it is not dispositive that Dr. Meghashyam also stated that 'decompression sickness may [have been] one of the causes of [claimant's] symptoms.' In an initial injury claim, claimant is not required to establish a particular diagnosis, such as 'decompression sickness.' Dr. Meghashyam stated that, regardless of a precise diagnosis, claimant's workplace exposure to the change in ambient pressure, resulting symptoms, and responses to clinical tests, necessitated a 'standard of care' treatment with hyperbaric oxygen. We find that sufficient to establish that it was medically probable that claimant's workplace exposure required medical services."

(Citations omitted; second, third, and fourth brackets in original.)

On appeal, employer makes two assignments of error. First, it contends that the board erred in "concluding that claimant could carry her burden of proving the compensability of her claim with a medical opinion stated in terms of 'possibility' rather than 'probability.'" Second, it contends that the board erred in "finding [that] the medical opinion of Dr. Meghashyam persuasively demonstrated that

claimant suffered a compensable injury when contrasted with the countervailing medical evidence."

We review the board's decision for legal error and substantial evidence. ORS 183.482(8)(a), (c); *Jackson County v. Wehren,* 186 Or App 555, 557, 63 P3d 1233 (2003). "Substantial evidence supports a finding when the record, viewed as a whole, permits a reasonable person to make that finding." *Jackson County,* 186 Or App at 557; ORS 183.482(8)(c).

The thrust of employer's first assignment is that, at most, the evidence showed that the pressurization incident could have been the cause of claimant's symptoms. That, according to employer, is not a sufficient quantum of certainty, because claimant was required to prove that it was "medically probable" that her symptoms were the result of the cabin's incomplete pressurization. We agree with employer's characterization of the record; Meghashyam believed only that claimant's symptoms "may" have been caused by her exposure to low cabin pressure. For the reasons explained below, however, we conclude that Meghashyam's testimony supports the board's conclusion that the hyperbaric chamber treatments were required medical services arising out of a workplace injury and, thus, compensable.

We begin with the relevant statute. Under ORS 656.005(7)(a), a "compensable injury" is "an accidental injury *** arising out of and in the course of employment requiring medical services or resulting in disability or death[.]" Thus, to establish a compensable injury a claimant must prove (1) that he or she suffered an "injury" in the course of her employment and (2) that that injury either resulted in a disability or death, or was at least severe enough to "requir[e] medical services." The statute does not provide a definition of the term "injury," so we have given that term its plain and ordinary meaning. *K-Mart,* 167 Or App at 50. Generally, "injury" means "hurt, damage, or loss sustained." *Id.* (citing *Webster's Third New Int'l Dictionary,* 1164 (unabridged ed 1993)). *Webster's* also explains that injury has "the most comprehensive" meaning of all the listed synonyms—hurt, damage, harm, and mischief—and may describe "an act or result involving an impairment or destruction of right,

health, freedom, soundness, or loss of something of value." *Id.*

In *K-Mart*, we also discussed when an injury "requires" medical services. In the course of that discussion, we rejected the notion that medical services are required only when "directed towards the cure of any existing, identifiable disease[.]" *Id.* at 50. Rather, we recognized that required services might include "diagnostic" procedures or "prophylactic treatment." *Id.* at 50-51. In *K-Mart*, for example, the claimant was exposed to blood and feces while assisting a customer who was HIV positive. *Id.* at 48. Although she did not contract any illness, claimant received prophylactic treatment and was tested for HIV and Hepatitis A and B. *Id.* Both the claimant's emergency-room physician and her treating physician agreed that "the exposure required both testing and prophylactic treatment." *Id.* at 51. On that basis, we concluded that the claimant's exposure to "serious, even life-threatening, pathogens" was compensable because that exposure "required medical services." *Id.*

Similarly, in *Finch v. Stayton Canning Co.*, 93 Or App 168, 170, 796 P2d 544 (1988), the claimant received diagnostic medical services for his wrist pain. A doctor diagnosed the claimant with carpal tunnel syndrome, but determined that the condition was "medically stationary and not disabling and did not recommend surgical treatment." We reasoned that, because the statute "makes no distinction between diagnosis and treatment," claimant had met her burden of proof by demonstrating that "medical services [were] required to determine what [was] wrong with her." *Id.* at 173; *see also Collins v. Hygenic Corp. of Oregon*, 86 Or App 484, 488, 739 P2d 1073 (1987) (diagnostic medical services were compensable even though they produced no "objective evidence of [claimant's] symptoms").

Employer attempts to distinguish this case from *K-Mart* by arguing that, unlike contact with bodily fluids from a person with HIV, there is no evidence that "a cabin altitude of 14,000 feet could be injurious." The first prong of the compensable injury analysis, however, requires only that a claimant establish that she suffered an injury in the course of her employment. There is ample evidence from

which a reasonable person could conclude that claimant sustained a "hurt, damage, or loss" as a result of the cabin failing to fully pressurize. Claimant testified that she had difficulty breathing, felt dizzy, and became nauseous. Those symptoms were severe enough that claimant sat down on the floor and requested oxygen. We also note that claimant's coworker had a similar, although less severe, reaction to the pressurization failure. Thus, claimant's symptoms represent an "injury" in the sense that they "hurt" claimant and, indisputably, occurred while claimant was at work.

The real question in this case, therefore, is whether that injury "requir[ed] medical services." Employer cites several cases for the proposition that, in order to prove that medical services were required, claimant had to demonstrate that it is "medically probable" that her workplace exposure was the cause of "her symptoms and the need for treatment." *See Queen v. SAIF*, 61 Or App 702, 658 P2d 563 (1983); *Gormley v. SAIF*, 52 Or App 1055, 630 P2d 407 (1981). Those cases are inapposite because, in both *Queen* and *Gormley*, the claimants sought medical treatment for a disability. Neither case involved a claim for medical services that were necessary in order to diagnose a claimant's symptoms.

Here, the hyperbaric treatments that Meghashyam prescribed had a diagnostic purpose. Meghashyam explained:

> "If a patient experienced change in ambient pressure and had symptoms associated with that, since we don't have a diagnostic gold standard to either confirm decompression sickness or refute it, then the standard of care, if the symptoms are significantly distressing to the patient or if the symptoms are neurological, the standard of care would be to treat her with a test of pressure, where we do a [hyperbaric oxygen treatment] and see how the patient does, and check for improvement."

Later in her deposition, Meghashyam reiterated that there is no diagnostic tool that can easily confirm or refute a diagnosis of decompression sickness. In other words, Meghashyam testified that the treatment she prescribed was necessary precisely because it would help confirm or refute her initial diagnosis that claimant was possibly suffering from

decompression sickness. Relying on Meghashyam's explanation, the board concluded that claimant had established that the hyperbaric treatments were necessary. That conclusion is consistent with our opinions in both *Finch* and *Collins*, which held that a claimant may prove that medical services are necessary by showing that they will help diagnose his or her symptoms. We, therefore, reject employer's first assignment of error.

In its second assignment of error, employer challenges the board's decision to defer to Meghashyam's medical opinion over the opinions of other experts. Ordinarily, the question of how to resolve competing expert medical opinions is within the discretion of the board. *Armstrong v. Asten-Hill Co.*, 90 Or App 200, 206, 752 P2d 312 (1988) ("[I]f there are doctors on both sides of a medical issue, whichever way the [b]oard finds the facts will probably have substantial evidentiary support."). In reviewing a medical expert's opinion, "we do not substitute our judgment for that of the board; rather, we determine whether the board's evaluation of that evidence was reasonable." *SAIF v. Pepperling*, 237 Or App 79, 85, 238 P3d 1013 (2010).

Here, the board concluded that claimant's injury was compensable based on Meghashyam's opinion that "claimant's exposure to abnormal cabin pressurization and resulting symptoms required medical services, specifically a 'test of pressure with hyperbaric oxygen.'" Meghashyam's opinion was based on claimant's exposure to a "change in ambient pressure," claimant's reported symptoms, and the results of certain tests that she asked claimant to perform during the examination. Employer relies heavily on the opinion of Burton who observed that a "decompression incident"[1] did not occur and that claimant's symptoms were likely "psychogenic in origin and unrelated to any workplace activities." Burton also opined that, because claimant was exposed to a cabin pressure of 14,000 feet for only 15 minutes, "[i]t is not plausible that she experienced any hypoxia, neurologic

---

[1] Employer's use of the phrase "decompression incident" is potentially confusing. By using that term, Burton meant to convey that the airplane cabin did not suddenly lose pressure at a high altitude. It is undisputed, however, that claimant did experience a change in ambient pressure as the airplane climbed in altitude and the cabin failed to fully pressurize.

dysfunction, or any other symptoms * * * caused by the circumstances of this flight." Meghashyam agreed that there is little evidence of healthy people developing decompression sickness after being exposed to an altitude of only 14,000 feet. She also testified, however, that she could not ignore claimant's symptoms and that, because different people may react differently to changes in air pressure, it is possible for someone to experience decompression sickness from exposure to an altitude of 14,000 feet. Meghashyam's testimony is supported by an "Altitude-Induced Decompression Sickness" fact sheet produced by the Federal Aviation Administration.[2]

Based on the record, we cannot say that it was unreasonable for the board to accept Meghashyam's medical opinion rather than Burton's. One could reasonably conclude that a test of pressure with hyperbaric oxygen was necessary based on claimant's exposure to a change in pressure, her symptoms, the results of Meghashyam's examination, and the relative difficulty of diagnosing decompression sickness. We, therefore, affirm the board's order concluding that claimant suffered a compensable injury.

Affirmed.

---

[2] Meghashyam cited a portion of the fact sheet that explained that

"[t]here is no specific altitude that can be considered an absolute altitude exposure threshold, below which it can be assured that no one will develop altitude [decompression sickness (DCS)]. However, there is very little evidence of altitude DCS occurring among healthy individuals at altitudes below 18,000 ft. who have not been SCUBA (Self Contained Underwater Breathing Apparatus) diving."